IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD-0533-05






CURTIS WAYNE POPE, JR., Appellant



v.



THE STATE OF TEXAS






ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW


FROM THE SECOND COURT OF APPEALS


TARRANT COUNTY






 Cochran, J., delivered the opinion of the Court, in which Keller, P.J.,
and Meyers, Price, Womack, Keasler, Hervey and Holcomb, JJ., joined. 
Johnson, J., filed a concurring opinion.


O P I N I O N 



 This is a case of first impression concerning the attorney work-product doctrine.

 Appellant was convicted of murder based, in part, upon his DNA being found at the
crime scene. After the State's DNA experts were cross-examined about the accuracy of their
DNA testing techniques and results, the State, on re-direct, questioned them about the
identity and "eminent" qualifications of another expert, Robert Benjamin, who was "involved
in the case." The State's experts also testified that they had forwarded their reports to Dr.
Benjamin and that he did not request further DNA testing. Although the jury was not told
that appellant had designated Dr. Benjamin as a possible testifying expert, the State argued
that if Dr. Benjamin or any other expert disagreed with the State's DNA experts, appellant
would have called that witness to testify. 

 Both at trial and on appeal appellant claimed that this testimony and argument violated
the attorney work-product doctrine and this was constitutional error as it impinged upon his
Sixth Amendment right to counsel. (1) The court of appeals found that neither Dr. Benjamin's
identity nor his qualifications were protected, but that testimony regarding Dr. Benjamin's
failure to request additional testing "indirectly" violated appellant's work-product
"privilege." (2) The court of appeals concluded, however, that the error was nonconstitutional
and harmless. (3) We conclude that none of the testimony was protected by the work-product
doctrine, and thus there was no error that affected appellant's Sixth Amendment right to
counsel. We affirm the judgment of the court of appeals. 

I.


 Appellant was charged with the murder of Darrell North, who was found stabbed to
death at his construction-site trailer. Mr. North had suffered over "50 distinct sharp force
wounds" to his head, face, back, chest, shoulders, and torso. Suspicion focused on appellant 
who, along with Mr. North, failed to keep a scheduled meeting with a pool-construction
customer on the evening of the murder. DNA tests tied blood found on the floor and
furniture at the crime scene, as well as on the victim's pants, to appellant. The statistical
probability of this DNA being that of another Caucasian male was one in 41.7 million.

 After appellant was charged, the State filed a Motion for Discovery of Expert
Witnesses asking for the name and address of any expert witnesses that the defense might
call at trial. Appellant later filed a motion for independent examination of the DNA evidence
and requested the trial court to "enter an order permitting Robert Benjamin to review and
examine all reports and testing already performed by William Watson for purposes of
deoxyribonucleic acid (DNA) testing and comparisons," as well as independent testing "if
necessary." The trial court granted appellant's motion. Less than a month later, appellant
formally designated "Dr. Robert Benjamin with the University of North Texas Department
of Biological Sciences" as a potential defense expert witness. The State then designated
eleven potential expert witnesses. Several months later, the trial judge granted a joint request
by the State and appellant to submit hair samples from the murder victim, appellant, and
Donald Fortenberry, another possible suspect, as well as fingernail scrapings from the murder
victim, for additional DNA testing. This additional DNA testing excluded Mr. Fortenberry,
but included appellant.

 Immediately before the State's first DNA expert testified at trial, appellant made a
motion in limine to bar any mention of Dr. Benjamin because his existence as a potential
defense witness was irrelevant. "I think it goes into work product. If he takes the stand,
that's a different story." The trial judge granted this motion. However, appellant's cross-examination of William Watson attacked the validity of the DNA testing procedures and test
interpretation. He suggested that (1) the PowerPlex 1.1 machine that Orchid Cellmark
(formerly GeneScreen) used to "run the gel" was not as good as the ABI-310 machine
because it requires more "professional judgment" to interpret the results, and (2) Mr. Watson
could not say with 100% certainty that the person who "ran the gel," Katherine Long, did it
correctly and "she's not here." 

 Before beginning his re-direct examination, the prosecutor approached the bench and
argued that appellant had opened the door to the existence and role of Dr. Benjamin as a
defense expert:

 [I]t is the State's position that due to their vigorous cross-examination as to the
accuracy and methodology and technique of Mr. Watson's analysis and
subsequent opinions, that it has now become a relevant matter of redirect to
demonstrate, first of all, that all of this witness's work papers, and well as
those of Ms. King [the State's second expert witness], were sent to Dr.
Benjamin for analysis and review, and that never at any time has their expert
ever contacted these folks and requested any opportunity to discuss any alleged
errors or mistakes in their work papers or protocol or secondly has there ever
been any request for any additional testing of the samples that they have in fact
done.


 Defense counsel objected that he had not opened the door with his cross-examination
and that any mention of Dr. Benjamin or his role in the case would violate the attorney work-product doctrine and appellant's due-process rights. Defense counsel argued that it was part
of his strategy to keep Dr. Benjamin out of the courtroom to prevent the State from arguing
that "this guy is teaching me," and that this "expert was appointed for them, and if there was
anything incorrect about it, they could bring him in here and tell you about it, folks." 

 The trial court noted, "So if I don't allow it in, then at final argument I can hear the
Defense standing up and saying, can you trust all of this evidence because it had all of these
problems in it, so how is that fair to the State?" The court further noted that the State's
expert had sent his lab reports directly to Dr. Benjamin and that appellant had the right to call
his expert if he wished. After further discussion, the trial court ruled that the State could ask
its expert "if he knows Dr. Benjamin, how he knows him, how long he's known him, . . . was
this witness aware that Dr. Benjamin was involved in this case," and whether Dr. Benjamin
had ever requested any further testing. 

 Mr. Watson then testified, over objection, that he knew Dr. Benjamin, who was
"eminently qualified"; he had delivered his notes and work papers to Dr. Benjamin; and he
was not requested by Dr. Benjamin, or anyone acting for him, to retest any of the work Mr.
Watson had done.

 Jamie King, the State's second expert, was also impeached with asserted deficiencies
in the DNA testing process. She, too, then testified that she knew Dr. Benjamin and had
taken a course from him. "I know he's used as a defense expert many times." She said that
she sent him her bench notes and had e-mail exchanges with him. No one had asked her to
retest any of the DNA material.

 During closing argument, the State noted that the defense "attacked the DNA, and
that's fine. Let them attack it." But, the State continued,

 The Defense under our constitution . . . has the right to issue subpoenas and
use the power of the State and the government to compel people to appear. .
. . They don't have to bring witnesses, but they can do so if it behooves them.

 And don't you know, don't forget this, if they had one person, one
expert who knew anything about DNA and the testing procedures, they would
have put somebody on that witness stand today. . . .

 [Appellant's objection overruled]

 And don't you know, Benjamin or anybody else, and Jamie testified,
yes, all of these notes were sent to him. Now, do you think he just threw them
in the trash? I think it's probably reasonable to conclude that perhaps he
looked at them. And don't you know that if he had any quarrel whatsoever
with the results these people at GeneScreen obtained, that he'd have decorated
that witness stand and said, you can't believe anything.

 But all you have, ladies and gentlemen, with regard to their challenge
for the DNA is [defense counsel's] theories. That's all you have. You have
no experts who challenged them. It has gone unrefuted.


 The jury convicted appellant and the court sentenced him to life imprisonment.

 On appeal, appellant complained of the trial court's ruling and the State's argument. 
In its analysis, the court of appeals first noted that "a testifying expert's identity, once
disclosed, is not work-product." (4) Second, it stated that "testimony regarding the witnesses'
knowledge of Dr. Benjamin's qualifications, and the materials provided to him, cannot be
privileged because they do not constitute work-product of the defense." (5) Third, it stated that

 we believe that the testimony elicited by the State regarding Dr. Benjamin's
failure to request additional testing indirectly violated Pope's work-product
privilege because the testimony could have had the effect of disclosing Dr.
Benjamin's mental impressions regarding the absence of a need for further
tests. (6)


The court of appeals concluded, however, that this was nonconstitutional error and harmless 
under Rule 44.2(b). (7)

II.


 The scope of the attorney work-product doctrine is sometimes confused with that of
the attorney-client privilege. The attorney-client privilege is an evidentiary privilege and
protects against the compelled disclosure of confidential communications. (8) This privilege
belongs to and protects the client. (9) The attorney work-product doctrine, while not a true
evidentiary privilege, belongs to and protects the attorney. (10) Its purpose is to stimulate the
production of information for trials, and it rewards an attorney's creative efforts by giving
his work product a qualified privilege from being shared with others. (11) It is premised on the
notion that an attorney should not be compelled to disclose the fruits of his labor to his
adversary. (12) Under Texas civil rules, material that reflects the attorney's personal thought
processes is "core work product" and receives absolute protection, while other materials,
such as documents, reports, or memoranda compiled by the attorney or his agents and
communications made in anticipation of litigation or trial are "other work product" and
receive qualified protection. (13) While the work-product doctrine protects the communications
of parties, attorneys, and agents, the underlying factual information is not protected. (14) For
example, descriptions of potential witnesses and statements that would reveal whether the
party had spoken to potential witnesses are not work product and are discoverable. (15) As
Professor Dix has explained:

 if defense counsel's efforts do not create or enhance the substantive
information, that information-or the form in which it is preserved-does not
become protected work product. (16)


That is, facts that are divulged by or exist independent of the attorney or his agents are not
protected, but statements or documents that set out their thoughts concerning the significance
of these facts or the strategic conclusions that the attorney or his agents draw from them may
well be protected. Thus, material prepared by a consulting expert appointed by the trial court
to assist the defense in developing strategies and theories is protected by the work-product
doctrine when that material reflects the expert's thoughts regarding the strength and
weaknesses of a defense theory. (17)

 Under Texas civil law, the world of experts is divided into two parts: consulting
experts and testifying experts. (18) "The identity, mental impressions, and opinions of a
consulting expert whose mental impressions and opinions have not been reviewed by a
testifying expert are not discoverable." (19) The Texas Supreme Court has stated that "[t]he
policy behind the consulting expert privilege is to encourage parties to seek expert advice in
evaluating their case and to prevent a party from receiving undue benefit from an adversary's
efforts and diligence." (20) But that protection "is intended to be only 'a shield to prevent a
litigant from taking undue advantage of his adversary's industry and effort, not a sword to
be used to thwart justice or to defeat the salutary object' of discovery." (21) 

 If a party might call an expert whom he has consulted as a witness at trial and the
opposing side has requested designation of any potential experts, the party must designate
that person as a testifying expert. A party who has designated a person as a potential
testifying expert must be willing to divulge his name, address, telephone number, resume,
and the subject matter on which he will testify. (22) Also subject to discovery in civil cases are
"the facts known by the expert that relate to or form the basis of the expert's mental
impressions and opinions formed or made in connection with the case in which the discovery
is sought, regardless of when and how the factual information was acquired;" (23) as well as
"the expert's mental impressions and opinions formed or made in connection with the case
in which discovery is sought, and any methods used to derive them[.]" (24) Thus, in civil cases,
there is no work-product protection for that potential testifying expert's data, tests, reports,
or opinions. 

 The nature and extent of the work-product doctrine in Texas criminal cases is
considerably less developed than it is in civil proceedings because there is very little pre-trial
discovery in criminal cases. (25) However, article 39.14(b) of the Texas Code of Criminal
Procedure was amended in 1999 to provide for limited reciprocal discovery of the opposing
side's potential expert witnesses. That provision, in pertinent part, states:

 On motion of a party and on notice to the other parties, the court in which
an action is pending may order one or more of the other parties to disclose
to the party making the motion the name and address of each person the
other party may use at trial to present evidence under Rules 702, 703, and
705, Texas Rules of Evidence. (26) 


The rule explicitly refers to any expert that the party "may use" at trial; it is not limited to
those that he actually "does use." (27) Thus, once a party designates a particular person as an
expert that he may use as a witness at trial, that person is no longer a "consulting" expert, he
is a "testifying" expert, and the opposing party, whether the State or the defendant, may seek
further information from or about him for use at trial. (28) 

 But what happens when the party who has designated a particular person as an expert
later decides that the expert's opinions and testimony could do its side more harm than good? 
This is a frequent problem in civil proceedings and has led to the formulation of an entire
body of legal disputes, often called "Red Rover" issues. (29) The first question is whether the
designating party can "de-disclose" the expert "by issuing some type of declaration that she
will not use the expert as a witness at trial." (30) The second question is what consequence, if
any, this de-designation warrants at trial. (31) Some courts have held that, absent "exceptional
circumstances," the opposing party may not call the de-designated expert, even though the
expert had formed his opinions, given his deposition, written his report, etc., before the act
of de-designation. (32) Other courts have held that there is no privilege protecting a retained
expert from being called by the opposing party. (33) Numerous criminal cases have held that
calling an expert witness originally designated by the defense does not violate the Sixth
Amendment. (34) One court noted that this position "is a minority one, although it has the
strong endorsement of a leading expert in the field of evidence." (35) A third group of courts
have held that the trial judge may use his discretion, balancing probative value against the
risk of unfair prejudice under Rule 403, to decide whether the opposing party may call,
depose, or otherwise use an expert originally retained and designated by the other side. (36)

 Courts that have permitted some use at trial of the opponent's de-designated expert
have frequently disallowed any explicit mention that the expert was originally retained by the
opponent. (37) They have noted that this information creates a danger that the jury will draw
two unwarranted and improper conclusions. First, it could create the impression that the
opposing party is suppressing evidence that it had an obligation to present. (38) Second, the jury
might believe that the "Red Rover" expert is more credible than other experts because he will
"tell the truth" regardless of the fact that he was originally retained and paid by the opposing
party. Accordingly, some courts have held that the information concerning who originally
hired an expert witness is either irrelevant under Rule 401 or inadmissible under Rule 403. (39)

 With this general background, we turn to the situation in the present case.

III.


 Here, appellant first requested that all of the DNA testing results and reports
conducted by the State's experts be sent to Dr. Benjamin. The trial court ordered the State
to do so and the reports were sent to Dr. Benjamin. Second, appellant formally designated
Dr. Benjamin as a potential testifying expert under article 39.14(b). Third, it was only at
trial, immediately before the State's first expert witness testified, that appellant requested that
the prosecution be prohibited from mentioning Dr. Benjamin, claiming that the mention of
his name as a designated expert witness would violate the work-product doctrine. The trial
judge granted appellant's motion in limine. Fourth, when appellant cross-examined the
State's first expert about his testing procedures, the testing equipment that he used, and the
reliability of his test results, the trial judge concluded that the defense had opened the door
to allow the State to ask its expert about Dr. Benjamin, his qualifications, his involvement
in this case, (40) and the fact that, although the State's expert had sent Dr. Benjamin a copy of
his reports, Dr. Benjamin had never requested any retesting. 

 Appellant claims,

 Allowing the State to introduce evidence establishing that Dr. Benjamin is an
eminently qualified defense expert who was provided with all of the State's
DNA testing material was inadmissible for the same reason that evidence of
his failure to request additional testing was: it could have no possible relevance
other than to allow the jury to conclude that Dr. Benjamin reviewed the State's
DNA testing and concluded it was accurate.


But Dr. Benjamin was, at all times, a formally designated expert witness for the defense. He
was never "de-designated." His identity and qualifications were not protected by any work-product privilege. (41) Appellant had publicly filed a formal motion requesting that all expert
reports be sent to Dr. Benjamin for his review. Information in the public domain is not
protected by the work-product doctrine. (42) As a part of his Motion for Independent
Examination of DNA Evidence, appellant also requested an "independent examination by
an expert of Defendant's own choice of the pertinent evidence" and "if necessary, to arrange
for a lab of the Defendant's own choice, to examine said evidence for the purposes" of
additional DNA testing and comparisons. This motion was granted in its entirety. The
contents of that motion, granted in open court by the trial judge, are not protected by the
work-product doctrine. (43) The work-product doctrine "is intended to protect and to act as a
limitation upon pretrial discovery of a lawyer's strategies, legal theories, and mental
impressions," (44) but information that the lawyer himself puts into the public domain via a
formally filed legal motion can hardly be thought of as a secret trial strategy.

 Finally, the fact that the State's experts did or did not receive a request from any
person to retest their samples or send samples to an independent lab for retesting by someone
else is not covered by the work-product doctrine. (45) This is a fact that is within the personal
knowledge of the State's experts. (46) Whether someone-anyone-called them, wrote to them, 
or otherwise communicated such a request to them could not be, by any stretch of the
imagination, the work product of the defendant's attorney. (47) The State's experts are not
agents of the defense attorney nor are they agents of Dr. Benjamin. The fact that neither Dr.
Benjamin nor anyone else requested additional testing is not an instance of the State
"'leaching' case preparation information from" its adversary. (48)

 The court of appeals concluded that Dr. Benjamin's failure to request additional
testing "indirectly" violated the work-product doctrine because the jury could have inferred
that Dr. Benjamin concluded that the original testing was accurate or he would have wanted
to do his own. (49) But this proves too much. It is always a possible inference that an expert
who could request additional testing but does not do so has concluded that additional testing
is unnecessary. And that inference might lead the jury to discern the expert's or the retaining
attorney's "mental impressions" about the need for retesting. (50) Similarly, an attorney who
fails to call an available eyewitness at trial might lead the jury to discern the attorney's
"mental impression" that the uncalled witness would testify unfavorably. Nonetheless, a
party may always comment on the fact that the opponent failed to call an available witness
and then argue "Don't you know, if Mr. X had anything favorable to say, my opponent would
have called him." (51) And this Court has already held that the State may comment upon the
defendant's failure to call a DNA expert when DNA evidence was offered by the State's
expert. (52)

 Juries are always entitled to draw reasonable inferences from known, unprivileged
facts, even though those inferences may have the effect of indirectly disclosing an attorney's
(or his agent's) mental impressions. What the work-product doctrine protects is the
production of material-documents, e-mails, letters, disclosure of conversations, and so
forth-and statements that set out an attorney's litigation strategy or opinions concerning the
result of his investigation or that of his agents. It does not prevent the factfinder from
making reasonable inferences from known facts.

 Appellant also argues that public-policy concerns should forbid the State from
mentioning the existence of his expert until and unless he calls that witness to testify at trial. 
He argues that a rule that permits the State to comment on the existence of such an expert and
his failure to contradict the State's experts will inevitably discourage defense attorneys from
fully investigating the facts of a case pretrial and that, in turn, would violate the defendant's
right to effective assistance of counsel under the Sixth Amendment. (53) Once again, this
argument proves too much. There is a simple solution: investigate first, consult second, (54)
designate third. The designation of a potential expert witness (55) under article 39.14(b) is an
act similar to crossing the Rubicon in that it may waive many of the protections otherwise
provided by the work-product doctrine, although it will not waive any confidential
communications under the attorney-client privilege.

 In sum, the trial judge in this case did not abuse his discretion in these Rule 403
rulings because the prosecutor's questions did not call for any disclosure of protected
attorney work-product. The careful trial judge prohibited any explicit mention that Dr.
Benjamin had been retained by appellant, a ruling that minimized the risk of any possible
"Red Rover" unfair prejudice. And the fact that neither Dr. Benjamin nor anyone else had
requested additional DNA testing is a simple fact known to the State's experts that is both
relevant under Rule 401 and non-prejudicial under Rule 403. Finding no attorney-work
product error, we affirm the judgment of the court of appeals.


Delivered: November 15, 2006

Publish
1. Appellant's grounds for review state

1. Does admission of evidence of (1) the identity of a non-testifying defense expert witness,
(2) the qualifications of the non-testifying defense expert witness, and (3) the fact that the
non-testifying defense expert witness reviewed materials provided by the State's expert
permit the jury to improperly infer that the non-testifying defense expert reviewed the
State's expert's work and concluded that it was correct, in violation of the Sixth
Amendment right to counsel and the corollary work-product privilege?

2. Does improper admission of evidence indicating that a non-testifying defense expert
reviewed the State's expert's work and did not request additional testing amount to a
violation of the Sixth Amendment right to counsel, or is it merely a violation of a non-Constitutional right?
2. Pope v. State, 161 S.W.3d 114, 121 (Tex. App.-Fort Worth 2004).
3. Id. at 121-23.
4. Pope, 161 S.W.3d at 120.
5. Id. at 121.
6. Id.
7. Id. at 121-23.
8. Tex. R. Evid. 503.
9. See West v. Solito, 563 S.W.2d 240, 245 (Tex. 1978, orig. proceeding). The Texas
Supreme Court explained that

 the purpose of the attorney-client privilege is to promote the unrestrained
communication and contact between an attorney and client in all matters in which
the attorney's professional advice or services are sought, without fear that these
confidential communications will be disclosed by the attorney, voluntarily or
involuntarily, in any legal proceeding.

Id.; see also Austin v. State, 934 S.W.2d 672, 673 (Tex. Crim. App. 1996) (stating that the
purpose of the privilege is to promote communications by protecting against the fear that
confidences will later be revealed). 
10. See United States v. Nobles, 422 U.S. 225, 238 (1975) (stating that "[a]t its core, the
work-product doctrine shelters the mental processes of the attorney, providing a privileged area
within which [the attorney] can analyze and prepare his client's case"); Washington v. State, 822
S.W.2d 110, 115-16 (Tex. App.-Waco 1991) (explaining that "the work-product doctrine is
designed for the benefit of the attorney"), rev'd on other grounds, 856 S.W.2d 184 (Tex. Crim.
App. 1993).
11. See Occidental Chem. Corp. v. Banales, 907 S.W.2d 488, 490 (Tex. 1995, orig.
proceeding) ("The attorney work product privilege protects two related but different concepts. 
First, the privilege protects the attorney's thought process, which includes strategy decisions and
issue formulation, and notes or writing evincing those mental processes. Second, the privilege
protects the mechanical compilation of information to the extent such compilation reveals the
attorney's thought processes"). See generally, Edward J. Imwinkelried, The Applicability of the
Attorney-Client Privilege to Non-Testifying Experts: Reestablishing the Boundaries Between the
Attorney-Client Privilege and the Work Product Protection, 68 Wash. U. L.Q. 19, 37-38 (1990). 
12. The Supreme Court explained the rationale for the doctrine in Hickman v. Taylor, 329
U.S. 495 (1947):

 Were such materials open to opposing counsel on mere demand, much of what is
now put down in writing would remain unwritten. An attorney's thoughts,
heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp
practices would inevitably develop in the giving of legal advice and in the
preparation of cases for trial. The effect on the legal profession would be
demoralizing. And the interests of the clients and the cause of justice would be
poorly served.

Id. at 511; see also Carmona v. State, 941 S.W.2d 949, 953 (Tex. Crim. App. 1997) ("The work-product doctrine is designed for the benefit of the lawyer by protecting the lawyer from being
compelled to disclose 'the fruits of his labor to his adversary'").
13. See Tex. R. Civ. P. 192.5; see also National Tank Co. v. Brotherton, 851 S.W.2d 193,
200 (Tex. 1993) (noting that the common law work-product doctrine had shielded from
discovery "specific documents, reports, communications, memoranda, mental impressions,
conclusions, opinions, or legal theories, prepared and assembled [by an attorney] in actual
anticipation of litigation or for trial").
14. See Axelson, Inc. v. McIlhany, 798 S.W.2d 550, 554 n.8 (Tex. 1990, orig. proceeding)
(noting that the work-product doctrine "protects only the mental impressions, opinions, and
conclusions of the lawyer and not the facts"); Leede Oil & Gas, Inc. v. McCorkle, 789 S.W.2d
686, 687 (Tex. App. - Houston [1st Dist.] 1990, orig. proceeding) (attorney's notes that were
mere "neutral recitals of facts" and contained no commentary by the attorney were not covered
by the work-product privilege).
15. City of Denison v. Grisham, 716 S.W.2d 121, 123-24 (Tex. App.-Dallas 1986, orig.
proceeding).
16. 42 George E. Dix & Robert O. Dawson, Criminal Practice and Procedure §
22.14 at 13 (2d ed. 2001).
17. Id. (citing Skinner v. State, 956 S.W.2d 532, 540 (Tex. Crim. App. 1997)).
18. The same is, to a large extent, true in the federal system. See, e.g., House v. Combined
Ins. Co. of Am., 168 F.R.D. 236, 245 (N.D. Iowa 1996) ("whether the witness has been
designated as an expert expected to testify at trial pursuant to Fed. R. Civ. P. 26(b)(4)(A) is a
very significant difference from the situation in which an expert has merely been consulted by a
party, but never designated as likely to testify at trial"). As noted in House,

 Parties should be encouraged to consult experts to formulate their own cases, to
discard those experts for any reason, and to place them beyond the reach of an
opposing party, if they have never indicated an intention to use the expert at trial. 
Such a consulted-but-never-designated expert might properly be considered to fall
under the work product doctrine that protects matters prepared in anticipation of
litigation. . . .

 However, once an expert is designated, the expert is recognized as
presenting part of the common body of discoverable, and generally admissible,
information and testimony available to all parties.

Id. (citations omitted).

 Fed. R. Civ. P. 26(b)(4) refines this distinction even more. It divides experts into four
classes and deals separately with each. These categories are: (1) experts a party expects to use at
trial; (2) experts retained or specially employed in anticipation of litigation or preparation for trial
but not expected to be used at trial; (3) experts informally consulted in preparation for trial but
not retained; and (4) experts whose information was not acquired in preparation for trial. See 8
Charles Alan Wright, Arthur R. Miller, & Richard L. Marcus, Federal Practice and
Procedure § 2029, at 428-29 (2d ed. 1994).
19. Tex. R. Civ. P. 192.3(e); see In re City of Georgetown, 53 S.W.3d 328, 334 (Tex.
2001) ("The rules of civil procedure delineate a category for consulting experts whose mental
impressions and opinions have not been reviewed by a testifying expert. The rules expressly
provide that a party is not required to disclose the identity, mental impressions, and opinions of
consulting experts.") (internal citation omitted).
20. Tom L. Scott, Inc. v. McIlhany, 798 S.W.2d 556, 559 (Tex. 1990, orig. proceeding).
21. Id. (holding that a settling party could not "assign" its experts to the opposing party,
who then redesignated the experts from "testifying" experts to "consulting-only" experts).
22. Tex. R. Civ. P. 192.3(e)(1), (2), (7).
23. Id. at 192.3(e)(3).
24. Id. at 192.3(e)(4).
25. See Carmona v. State, 941 S.W.2d 949, 953 (Tex. Crim. App. 1997).
26. Tex. Code Crim. Proc. art. 39.14(b). The pertinent phrase, "each person the other
party may use at trial to present evidence under Rules 702, 703, or 705" is almost exactly the
same wording as is used in Rule 26(a)(2)(A) of the Federal Rules of Civil Procedure ("any
person who may be used at trial to present evidence under Rules 702, 703, or 705"). We assume
that the Texas Legislature, by following the wording of the federal rule, also intended to follow
the federal interpretation of that wording. For a thorough discussion of the federal civil rule, the
history of the work-product doctrine, its scope and applicability to expert witnesses, see Wright
& Miller, supra note 18, §§ 2021-2033.
27. See Stephen D. Easton, "Red Rover, Red Rover, Send that Expert Right Over":
Clearing the Way for Parties to Introduce the Testimony of Their Opponents' Expert Witnesses,
55 SMU L. Rev. 1427, 1461 (2002) ("the Rule 26(a)(2)(A) disclosure is not a statement that an
attorney will call an expert as a witness at trial. Instead, this disclosure is a required statement
that the expert might be called as a witness at trial").
28. See, e.g., Doe v. Eli Lilly & Co., 99 F.R.D. 126 (D.D.C. 1983). In the context of expert
witnesses, the court stated,

 As a general proposition, . . . no party to litigation has anything resembling a
proprietary right to any witness's evidence. Absent a privilege no party is entitled
to restrict an opponent's access to a witness, however partial or important to him,
by insisting upon some notion of allegiance. Even an expert whose knowledge
has been purchased cannot be silenced by the party who is paying him on that
ground alone. Unless impeded by privilege an adversary may inquire, in advance
of trial, by any lawful manner to learn what any witness knows . . . .

Id. at 128 (citations omitted).

 Article 39.14 of the Code of Criminal Procedure does not provide for mandatory
depositions of experts, interrogatories, disclosure of reports or the whole host of other discovery
mechanisms available in civil proceedings. That failure, however, does not imply that the work-
product doctrine necessarily continues to protect otherwise discoverable materials once the State
or defendant designates an expert witness. As noted by Professor Easton, "[a]fter an expert has
been disclosed by the retaining attorney, muzzling that witness may be unfair to the opposing
party for several reasons," one of which is that "a party ordinarily should be able to count on the
availability of the testimony of a person who has been declared to be a potential witness at trial." 
Easton, supra note 27 at 1478.

 Article 39.14(a) provides for limited pretrial discovery by the defendant of certain
material in the State's possession. This article explicitly protects "the work product of [the
State's] counsel in the case and their investigators and their notes or report." Presumably, the
trial court concluded that written reports by those persons who have been formally designated as
a potential expert witness are not protected by the work-product doctrine. Otherwise, the trial
court would not have ordered the State to send its experts' written notes and DNA reports to Dr.
Benjamin.
29. See generally, Easton, supra note 27. The term "Red Rover" refers to the children's
playground game in which one team "calls over" a member of the opposing team who must try to
break through the hand-holding members of the calling team. If that person cannot break through
the human chain, he becomes a member of the calling team. Id. at 1437 n.49.
30. Compare id. at 1438-39 & n.55 (collecting cases) with id. at 1463 (noting that, under
the federal rules of civil procedure, there is no mechanism to "de-designate" a previously
designated expert witness and arguing that there should not be). Several Texas civil cases have
held that a "testifying expert [may] be 'de-designated' so long as it is not part of 'a bargain
between adversaries to suppress testimony' or for some other improper purposes." In re Doctor's
Hosp. of Laredo, Ltd., 2 S.W.3d 504, 506 (Tex. App.-San Antonio 1999) (quoting Castellanos v.
Littlejohn, 945 S.W.2d 236, 240 (Tex. App.-San Antonio 1997, orig. proceeding).
31. Easton, supra note 27 at 1439-47. 
32. See Durflinger v. Artiles, 727 F.2d 888, 891 (10th Cir. 1984); see also In re Shell Oil
Refinery, 132 F.R.D. 437, 440-41 (E.D. La. 1990) (suggesting that if a party notifies its opponent
prior to the deadline for designation of expert witnesses that a particular expert will not be
testifying, that party may designate him as a non-testifying or "consulting" expert even though
his initial expert reports had been disclosed to the opposing side).
33. See, e.g., Knoff v. American Crystal Sugar Co., 380 N.W. 2d 313, 319-21 (N.D. 1986);
Granger v. Wisner, 656 P.2d 1238, 1240 (Ariz. 1982). 
34. See, e.g., Noggle v. Marshall, 706 F.2d 1408, 1414-17 (6th Cir. 1983) (noting that no
Fifth or Sixth Amendment violation or "violation of a constitutionally mandated attorney-psychiatrist-client privilege occurred when the state called as its witness a defense-retained
psychiatrist" in rebuttal of defendant's insanity defense); State v. Riddle, 8 P.3d 980, 990 (Or.
2000) (holding that there is no attorney-client privilege, work-product doctrine privilege, or state
precedent "that prevents an expert whom a litigant has employed to investigate a factual problem
from testifying for the other side as to the expert's thoughts and conclusions that are segregated
from confidential communications"; stating that the State was not barred from calling a defense-employed accident reconstruction expert as its witness as long as it did not elicit any confidential
communications or work product).
35. Riddle, 8 P.3d at 989 n.5 (citing Edward J. Imwinkelried, The Applicability of the
Attorney-Client Privilege to Non-Testifying Experts: Reestablishing the Boundaries between the
Attorney-Client Privilege and the Work Product Protection, 68 Wash. U. L. Q., 19, 28-30
(1990)).
36. See, e.g., House v. Combined Ins. Co. of Am., 168 F.R.D. 236, 245-46 (N.D. Iowa
1996); White v. Vanderbilt Univ., 21 S.W.3d 215, 224 (Tenn. Ct. App. 1999) (setting out various
Rule 403 factors, balancing them and holding that plaintiff should have been permitted to use
defendant hospital's de-designated expert's deposition at trial, but noting that proponent must
first remove any reference to the fact that the expert had been initially consulted by the
defendant).
37. See Peterson v. Willie, 81 F.3d 1033, 1037-38 (11th Cir. 1996); 
 Rubel v. Eli Lilly & Co., 160 F.R.D. 458, 460 (S.D.N.Y. 1995); Granger v. Wisner, 656
P.2d at 1242; General Motors Corp. v. Jackson, 636 So. 2d 310, 314-15 (Miss. 1994); Seeber v.
Howlette, 586 N.W.2d 445, 451 (Neb. 1998). But see Cogdell v. Brown, 531 A.2d 1379, 1382
(N.J. Super. Ct. Law. Div. 1987); (stating that
the identity of the party who originally retained an expert is material to the weight and credibility
of the expert's testimony).
38. Granger v. Wisner, 656 P.2d at 1242-43 (allowing the defendant to elicit, on direct
examination, that the plaintiff had originally retained the expert "would only serve to unfairly
prejudice the plaintiff. Jurors unfamiliar with the role of counsel in adversary proceedings might
well assume that plaintiff's counsel had suppressed evidence which he had an obligation to offer.
Such a reaction could destroy counsel's credibility in the eyes of the jury"); see 8 Charles A.
Wright et al., Federal Practice and Procedure § 2032, at 447 (2d ed. 1994) (calling this
information "explosive").
39. See State v. Hamlet, 944 P.2d 1026, 1031-33 (Wash. 1997) (holding that State could
call expert who was originally retained by defendant in preparation of diminished capacity
defense, but it was error, though harmless, to permit him to testify that he was retained by the
defendant); State v. Wilkinson-Snowden-McGehee, Inc., 571 S.W.2d 842, 843 (Tenn. Ct. App.
1978); Agron v. Trustees of Columbia Univ., 176 F.R.D. 445, 450-53 (S.D.N.Y. 1997) (denying
plaintiff student's motion in limine to preclude the testimony of an expert witness for the
defendant university, but prohibiting any reference to his original retention by the plaintiff and
requiring that copies of his report be redacted to eliminate any such references); Dovel v. Walker
Manuf., 174 F.R.D. 649 (D.C. Neb. 1996); see also Imwinkelried, supra note 35 at 47 (noting
that, in Red Rover situations, "the trial judge could admonish the prosecutor and expert to refrain
from any mention of the defense's consultation with the witness" under Rule 403 if "the jury is
likely to ascribe too much significance to the defense's earlier consultation with this prosecution
witness").
40. The trial judge should be complimented for being remarkably fast on his feet in
minimizing the risk of prejudice under Rule 403 by prohibiting the State from explicitly stating
that Dr. Benjamin had been retained by appellant. 
41. See Tex. R. Civ. P. 192.3(e); Fed. R. Civ. P. 26(a)(2)(A); see also House v. Combined
Ins. Co. of Am., 168 F.R.D. 236, 245 (N.D. Iowa 1996); White v. Vanderbilt Univ., 21 S.W.3d
215, 225 (Tenn. Ct. App. 1999).
42. See Carmona v. State, 941 S.W.2d 949, 953-54 (Tex. Crim. App. 1997) (discussing
waiver of attorney-client privilege by public disclosure).
43. Id.
44. Morris v. State, 477 A.2d 1206, 1211 (Md. Ct. Spec. App. 1984). Put more colorfully,
the work-product doctrine operates primarily to protect against pretrial discovery, on the basis
that each litigant should be expected to prepare its own case and courts should "discourage lazy
or unscrupulous lawyers from trying to cut case-preparation corners by leaching basic
information or valuable opinions from experts retained by their opponents." Brown v. Ringstad,
142 F.R.D. 461, 465 (S.D. Iowa 1992).
45. See, e.g., Morris, 477 A.2d at 1211 (stating that "[t]here is a distinction to be made,
however, between the disclosure of confidential communications whether made to an attorney or
to an agent consulted by the attorney and information gained by objective scientific analysis
conducted by experts, no matter by whom employed").
46. Similarly, Dr. Benjamin's "eminent" qualifications and professional standing were facts
known to the State's experts-they were, after all, his former students-well before defense
counsel retained him as a potential expert witness. And Dr. Benjamin's professional credentials
existed independent of defense counsel's act of retaining him or any work-product strategy or
conclusions that might have been developed on appellant's behalf. The only issue that the trial
court, court of appeals, or this Court is asked to decide is whether Dr. Benjamin's existence and
qualifications are protected by the work-product doctrine or the Sixth Amendment right to
counsel. Whether the trial court might have considered the validity of some other, unrelated
objection at trial is not before us because such an objection was never made.
47. Appellant states that "[t]here is no doubt that Dr. Benjamin's 'conclusions were the
work product of defense counsel and would never have been provided to the prosecutor.' See
Taylor v. State, 939 S.W.2d 148, 152 (Tex. Crim. App. 1996)." But Taylor was decided before
the legislature enacted the reciprocal-discovery statute. We need not decide, in this case, what
effect, if any, that statute would have upon our previous opinions dealing with the work-product
doctrine as it applies to designated experts.
48. Dovel v. Walker Manuf., 174 F.R.D. 649 (D.C. Neb. 1996) (allowing plaintiff to call
her former physician, who had previously been retained by the defendant to perform an
independent examination and prepare an expert report, as an expert witness at trial).
49. Pope, 161 S.W.3d at 121.
50. Indeed, the court of appeals appears to have recognized this fact as it noted that
appellant's 

 assertion that the jury could have only come to the conclusion that the defense's
expert agreed with the State's experts is a logical conclusion that the jury could
have reached from admissible evidence; that is, there was a DNA expert who
reviewed the state's materials but was not called as a witness by the defendant.

161 S.W.3d at 122.
51. See Patrick v. State, 906 S.W.2d 481, 491 (Tex. Crim. App. 1995) (argument that
points to a defendant's failure to produce evidence other than his own testimony is proper);
Caron v. State, 162 S.W.3d 614, 618 (Tex. App.-Houston [14th Dist.] 2005, pet. ref'd)
(prosecutor may comment on defendant's failure to present evidence; "if there is something out
there that is going to exonerate you, you want to make it known" was proper argument); Torres v.
State, 979 S.W.2d 668, 673-74 (Tex. App.-San Antonio 1998, no pet.) (prosecutor could
comment on defendant's failure to call a defense expert). 
52. Jackson v. State, 17 S.W.3d 664, 674 (Tex. Crim. App. 2000) (stating that prosecutor's
argument that "the defense would have called its [DNA] expert to the stand if it had seriously
disputed the State's evidence" did not shift the burden of proof to the defense and was a
permissible "comment on the defendant's failure to produce witnesses and evidence" because it
did "not fault the defendant for exercising his right not to testify"); see also Faison v. State, 59
S.W.3d 230, 243 (Tex. App.-Tyler 2001, pet. ref'd) (prosecutor's argument-that it was a
reasonable deduction from the evidence that the defense did not present its own expert testimony
about DNA testing because its expert had reached the same results as had the State's expert-
upheld as a reasonable deduction from the evidence).
53. Appellant's Brief at 14-15.
54. See, e.g., Williams v. State, 958 S.W.2d 186, 192-94 (Tex. Crim. App. 1997) (defendant
is entitled to make an ex parte motion for expert assistance under Ake v. Oklahoma, 470 U.S. 68
(1985) to protect work product and defensive strategy).
55. Other acts, such as a formal request that certain materials in the State's possession be
shown to or shared with a particular expert, will have the same effect of publicly disclosing the
existence of an expert who is more than a consultant, but less than a formally designated expert
witness.